ANNIE PEARLSTEIN, administratrix, *vs.* NEW YORK, NEW HAVEN, AND HARTFORD RAILROAD COMPANY.

SAME *vs.* SAME.

ANTONY YELKIN *vs.* SAME.

Barnstable.   March 12, 1906. — May 17, 1906.

Present: KNOWLTON, C. J., MORTON, LATHROP, LORING, & BRALEY, JJ.

*Negligence.   Railroad.*

In actions respectively at common law and under R. L. c. 111, § 267, against a railroad company by the administratrix of the estate of one killed after conscious suffering by a heavy iron machine falling upon him while under the direction of the defendant's freight agent it was being unloaded from the cart of the intestate by the use of skids in an attempt to place it in a car of the defendant, evidence that an employee of the defendant, who was standing in the car holding a rope hitched to the machine with which he was expected to steady it and help to keep it in position, started to jump, dance and whistle and jerk the rope, but when told by an employee of the plaintiff's intestate to "stop" did not repeat these actions, and was pulling upon the rope at the time of the accident, is evidence for the jury of negligence of a servant of the defendant which will support a verdict in the action at common law for the injuries and conscious suffering of the plaintiff's intestate, but is not evidence of gross negligence of a servant of the defendant in the action under the statute and will not sustain a verdict for the plaintiff in such action.

If the driver and proprietor of a tip cart and his employee who is assisting him in transporting a heavy iron machine for shipment by freight on a railroad, by direction of the freight agent of the railroad company, attempt to deliver the machine directly at the freight car, the floor of which is two feet higher than the cart, instead of at the station platform which is on a level with the cart, and, while they are assisting the freight agent and his assistant in moving the machine on skids placed by the freight agent as a bridge from the cart to the car, the machine falls and injures them owing to the negligence of the servant of the railroad company assisting the freight agent, they can be found to have been in the exercise of due care and not to have assumed the risk of such an accident.

The facts, that a freight agent at a railroad station insisted on receiving a heavy iron machine directly into a freight car, the floor of which was two feet higher than the cart in which the machine was brought for delivery, instead of receiving

it on the station platform which was of the same level as the cart, and that, as the freight agent and another servant of the railroad company, assisted by the proprietor of the cart and his employee, were attempting to move the machine on rollers upon skids placed by the freight agent as a bridge from the cart to the car, the machine fell and killed the proprietor of the cart after conscious suffering, even if they are evidence of negligence on the part of the freight agent which would sustain a verdict against the railroad company in an action at common law for the injuries and conscious suffering of the deceased, which was not passed upon, are not evidence of negligence of the freight agent greater than a mere want of ordinary care, and will not sustain a verdict against the railroad company in an action brought by the administratrix of the estate of the deceased under R. L. c. 111, § 267, for causing his death.

THREE ACTIONS OF TORT, the first action at common law by the administratrix of the estate of Max Pearlstein, the owner of a tip cart and two horses, for injuries and conscious suffering of the plaintiff's intestate caused by a heavy iron machine falling upon him while it was being unloaded from his cart in an attempt to place it in a freight car of the defendant, alleged to have been due to the negligence of the defendant in not supplying suitable appliances for shipping the machine and to the negligence of the defendant's servants and agents while engaged in such shipping, the second action by the same plaintiff as administratrix under R. L. c. 111, § 267, for the benefit of herself, as widow of the intestate, and his children, for causing his death by the same accident, and the third action at common law by Antony Yelkin, employed by Pearlstein, for personal injuries caused by the same accident. Writs dated March 8, 1905.

In the Superior Court the three cases were tried together before *Fessenden*, J. The material conclusions of fact warranted by the evidence are stated in the opinion.

The testimony of the plaintiff Yelkin was as follows:

" I live in Boston, I know Max Pearlstein, worked for him. I came from Russia about six years ago, I had known Max Pearlstein three or four years ago, Mr. Pearlstein was a junk man, I went around with him and did a little farming, he owned the horses and the tip cart, I remember November 26, 1904, Mr. Pearlstein was killed that day, we went in morning to Osterville to Mr. Crosby's to take a machine to West Barnstable for freight, we put it on the tip cart, then went to dinner and fed the horses, after dinner we went to West Barnstable with the

machine, went to the freight house, we took it to the platform, I turned the horses around and backed up to the platform, the freight man [Hiller] came and said, 'That is the car for the machine,' and showed us the car in which to put the machine, Mr. Pearlstein said, 'I don't want to put it in the car; I want to put it on the platform,' the freight man said, 'I want you to put the machine into the car.' He said, 'I want you to turn the horses around and back up to the car and put the machine into the car.' I said, 'No, I can't do it.' I said, 'The big piece of iron weighs eight or nine hundred, and is pretty heavy, and there is not enough men here — just three men.' And he said, 'I will get you some rope.' The machine was about two and a half feet wide and about five or six feet long, the platform was just like the tip cart, just the same height when the tail-board was let down, then I turned horses around and backed up to the car and blocked the wheels, Mr. freight man told me to bring that ladder [skids], I picked the ladder up and put it on the cart and put it in the car, after I brought the ladder the freight man put the ladder in the car, and he bring two rollers, Max was pushing the rollers under the machine, I asked the freight man 'Have you got any rope in here?' and he said, 'No, I no got any rope'; and he went and got a rope and he tied up the machine with a rope — the freight man tied the rope in the car, around a rod next to the opposite door of the car, I did not see the place where it was tied; but I saw it was tied and the freight man tied it, I didn't see anybody else in the car, I didn't look, the freight man jumped from the car to see about his ladder and called the fellow who was all the time helping about jobs [Cook], told him to jump in the car and gave him this rope and said, 'You keep this,' when we started to move the machine he said to him, 'You hold the rope and pull.' The man that the freight man called I had seen before, taking barrels of cranberries and lifting them into the car, working for the railroad, came from another car. The freight man called him to help move the machine into the car. The floor of the car was about two feet higher than tip cart, about ten feet from car to tip cart, we started moving machine from tip cart on to the ladder, fellow in car holding rope, we had got it about half way up the ladder, about same distance from car and from cart, I said to him [freight

man] 'we cannot push the machine; it is too high and there is not enough men' and he said 'push it.' But he told this fellow to stay in the car and keep the rope and pull, and we pushing the machine, and this fellow stayed in the car and pulled the rope, and started to jump, and dance and whistle, and stopped pulling the machine. And I said 'John, you keep the rope good. Do not play with the rope because the machine will fall down.' Well for three or four minutes the machine went, and then it fell down, and fell on this shoulder, and scraped my head, and I fell with the machine, and moved it four or five inches before it fell down. After I said 'stop, John' I started moving the machine and the next thing that happened, the machine fell and I with it. Pearlstein was standing at my back, the freight man and Crocker on the other side of ladder. Crocker came from Parker's store and was helping the freight man. I could not do anything for five or six weeks. I sat down for five or six minutes, it was dark to me, after the accident I saw Mr. Pearlstein at the machine, it was killing his head, he was taken into a store and in forty minutes was dead. The skid was about a foot and a half wide, the machine was a little wider than the skid. Pearlstein said, 'Tony, I can't get up. I have a broken leg.' He lived about forty minutes. I was struck by the machine and it made a scar on my head."

His cross-examination was as follows :

"We had two horses, we drove into the grounds near the station and near Parker's store, I did not know station agent or baggage master, nor assistant baggage master, saw a man on platform, Pearlstein said 'Where shall we put this machine?' the man asked 'Where is it going?' Pearlstein said 'It is going to Boston,' the man said 'It goes in that car right over there,' the cart was just about at the platform, and the freight man pointed at the car, the land was perfectly level, I or Pearlstein drove the horses over near the car and backed the cart up against the door of the car, at this time another railroad man was in another car arranging cranberries. The freight man brought the ladder alone, the freight man put the ladder on to the tailboard of the cart, and into the car, the freight man took the bar and bringing these two rollers and lift this machine and was pushing the rollers under the machine, I had two rollers in

the wagon from Osterville, and a small piece of rope from Osterville, the freight man worked the machine ahead with the crowbar, he showed us everything to do, a boy* was in the car holding the rope, I and Max were on one side and Hiller and Crocker on the other side."

" *Q.* And you were all pushing, and this boy inside of the car was pulling on the rope? *A.* Yes.

" *Q.* Now, do you say he was jumping around, dancing and whistling and jerking on the rope? *A.* Yes, sir.

" *Q.* And you said to him 'Stop, John, what are you doing?' *A.* Yes.

" *Q.* 'Stop your dancing'? *A.* Yes, sir.

" *Q.* 'Stop your laughing'? *A.* Yes, sir.

" *Q.* And what did he do then, when you said 'Stop, John', did he stop? *A.* He stopped this time.

" *Q.* And this time he was dancing and laughing and jerking on the rope? *A.* Yes, sir.

" *Q.* And all the time you four men were trying to push this heavy machine up on to those skids? *A.* Yes, sir.

" I don't know what made the machine fall, I did not hear Cook or Hiller say, 'Look out,' I did not hear Pearlstein say to the crowd, 'All right,' 'all hands pull,' 'All right, go ahead,' or anything like that."

His re-direct examination was as follows :

" When we drove into the yard we drove up to the platform first, we saw the freight man as we drove in, the freight house is right in front, the car was on our left, we drove to the freight house, we turned our team around and saw the car, he told us he wanted us to put the machine in the car, and I told him we wanted some ladders."

In the first and third actions, at common law, the judge refused to order verdicts for the defendant, and refused to rule as requested by the defendant, that the plaintiff's intestate and the plaintiff Yelkin were not in the exercise of due care, that there was no sufficient evidence to warrant the jury in finding that the injury to the plaintiff's intestate and the plaintiff Yelkin occurred by reason of the negligence of the defendant, its ser-

---

* Cook was twenty-one years of age at the time of the trial, which was a little more than a year after the accident.

vants or agents, and that the plaintiff's intestate and the plaintiff Yelkin knew the situation, knew the weight of the machine and knew the danger and voluntarily assumed the risk.

In the second action, under R. L. c. 111, § 267, the defendant asked the judge to order a verdict for the defendant, and to rule as follows:

1. That the plaintiff's intestate was not in the exercise of due care.

2. That there is no sufficient evidence to warrant the jury in finding that the death of the plaintiff's intestate occurred by reason of gross negligence of any of the defendant's servants or agents.

3. That the plaintiff's intestate knew the situation, knew the weight of the machine, and knew the danger and voluntarily assumed the risk.

The judge refused to make any of these rulings, and submitted the three cases to the jury, submitting also to the jury two special questions which they answered as follows:

" 1. Was Max Pearlstein (or was Anthony Yelkin) in the exercise of due care?" The jury answered " Yes."

" 2. Did Max Pearlstein (or did Anthony Yelkin) assume the risk?" The jury answered " No."

The jury returned a verdict for the plaintiff in each of the cases, in the first case in the sum of $250, in the second case in the sum of $2,000, and in the third case (Yelkin's) in the sum of $200. The defendant alleged exceptions in each case.

*R. A. Hopkins,* for the defendant.

*L. Bryant,* (*H. M. Hutchings* with him,) for the plaintiffs.

KNOWLTON, C. J. These actions were brought to recover damages caused by the falling of a heavy iron machine while it was being moved from the rear end of a two horse cart into a freight car at the defendant's railroad station. The intestate of the plaintiff in the first two actions survived less than an hour after the accident, and died from the effects of it. The plaintiff in the third action was injured, but not very seriously. There was much contradiction between the testimony of the plaintiff Yelkin and that of most of the other witnesses in regard to some of the circumstances preceding and attending the accident. From his testimony the jury might have found

that one Cook, who was employed by the defendant in unloading freight at the station, was negligent in starting to jump, dance, and whistle and jerk the rope, while standing in the car holding a rope hitched to the machine with which he was expected to steady the machine and help to keep it in position. Although this testimony was contradicted by the other witnesses, the jury might have believed it, and have found that Cook's negligence was one of the causes of the accident.

This was enough to entitle the plaintiffs to go to the jury in the actions at common law, if there was evidence that Yelkin and the deceased Pearlstein were in the exercise of due care. They were engaged in the performance of their duty, as they understood it, and it cannot be held as matter of law that they were negligent, nor does it appear that they assumed the risk of such an accident. They were not in any relations of contract with the defendant, whereby the defendant was relieved from the duty of seeing that its servants exercised proper care in the work in which they were engaged, and it cannot be said as matter of law that they understood, appreciated and assumed the risk, especially the risk of Cook's negligence, if he was negligent.

It is not necessary to decide whether the jury would have been warranted in finding that Hiller, the freight agent, was negligent in choosing the place in which the machine should be delivered by Pearlstein, and accepted by the defendant, and in directing the manner of its delivery and acceptance. We think the evidence tends to show that these matters were determined by Hiller, and that Pearlstein and Yelkin were acting, in part at least, under his direction in trying to load the machine upon a freight car directly from the cart in which it was brought to the station. If it had been unloaded from the cart upon the platform the accident would have been less likely to happen. As there was evidence of negligence on the part of the defendant's servant Cook, this subject becomes unimportant in the two actions at common law, in which the exceptions must be overruled without reference to Hiller's conduct.

The action brought to recover for the death of Pearlstein stands on different grounds. To recover in this the plaintiff was bound to show negligence on the part of the corporation itself,

or unfitness or gross negligence on the part of its servants. There was no evidence to sustain the averment that the corporation was negligent in failing to provide suitable apparatus and appliances for loading its freight, nor was there any evidence to show the unfitness of the defendant's servants for the work in which they were engaged.

We come, therefore, to the question whether there was evidence of gross negligence on the part of these servants. If the jury might have found that Hiller was negligent in attempting to receive the machine for the company upon the car, to which it was to be transferred from the cart by rolling it over the skids, called by some of the witnesses a ladder, there is no evidence that his negligence was greater than a mere want of ordinary care. The jury would not have been warranted in finding gross negligence on his part. There was no evidence of other negligence on the part of any of the defendant's servants, except that of Cook, to which we have referred. The plaintiff Yelkin was the only witness who testified to this, and, if we give full effect to all he said, Cook stopped his objectionable conduct before the accident, when Yelkin said " Stop, John ", and did not repeat it. The evidence of this plaintiff, as well as that of the other witnesses, tends to show that Cook held the rope all the time, and was pulling upon it at the time of the accident. The testimony goes no further than to show that probably he did not pull upon it so effectively as he might have done. While the jury might have found that failure on his part to do his work to the best of his ability was one of the causes of the accident, we think they would not have been warranted in finding that he was guilty of gross negligence which caused the machine to fall. The difference in degree between ordinary negligence and gross negligence, recognized or created by the statute, is material, and cannot be ignored in the trial of cases. R. L. c. 111, § 267; c. 171, § 2. *Brennan* v. *Standard Oil Co.* 187 Mass. 376, 378. In the action founded on the death of Pearlstein there was no evidence to warrant a submission of the case to the jury, and the result is that in this action the exceptions are sustained. In the other two actions they are overruled.

*So ordered.*